IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Laura Nimmons, | ) | C/A No.: 3:16-3215-JFA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER** |
| | ) | |
| South Carolina Department of Corrections, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The Plaintiff, Laura Nimmons ("Nimmons") filed this action against her former employer, Defendant South Carolina Department of Corrections ("SCDC"), alleging race discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964.[1] (ECF No. 1).

## I.    PROCEDURAL BACKGROUND

Plaintiff removed the present matter to this Court on September 23, 2016. (ECF No. 1). On September 12, 2017, the Defendant moved for summary judgment. (ECF No. 22). The Plaintiff responded to the Defendant's Motion on October 18, 2017 (ECF No. 33), and the Defendant replied to the Response on October 25, 2017 (ECF No. 35).

---

[1] Plaintiff originally brought a total of four claims: (1) Title VII Race Discrimination; (2) Title VII Retaliation; (3) ADAAA Disability Discrimination; and (4) FMLA Retaliation. (ECF No. 1-1). Plaintiff voluntarily dismissed the third and fourth causes of action. (ECF No. 16). Therefore, only the first and second causes of action are before this Court.

Thereafter, in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.), the case was referred to a Magistrate Judge for Review. The Magistrate issued a Report and Recommendation ("Report") on April 23, 2018. (ECF No. 41). On May 4, 2018, the Plaintiff filed objections to the Report. (ECF No. 46). The Defendant replied to Plaintiff's Objections on May 14, 2018. (ECF No. 47).

Therefore, this matter is ripe for review.

## II.    LEGAL STANDARD

The Magistrate Judge assigned to this action[2] prepared a thorough Report and Recommendation and opines that Defendant's Motion for Summary Judgment (ECF No. 22) should be granted. (ECF No. 41). The Report sets forth, in detail, the relevant facts and standards of law on this matter, and this Court incorporates those facts and standards without a recitation.

A district court is only required to conduct a de novo review of the specific portions of the Magistrate Judge's Report to which an objection is made. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b); *Carniewski v. W. Va. Bd. of Prob. & Parole*, 974 F.2d 1330 (4th Cir. 1992). In the absence of specific objections to portions of the Magistrate's

---

[2] The Magistrate Judge's review is made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.). The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261 (1976). The Court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b)(1).

Report, this Court is not required to give an explanation for adopting the recommendation. *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983). Thus, the Court must only review those portions of the Report to which Plaintiff has made a specific written objection. *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 316 (4th Cir. 2005).

## III.    ANALYSIS

Plaintiff has made several objections to the Report, most of which are repetitions of Plaintiff's arguments in her Response to the Defendant's Motion for Summary Judgment. (ECF No. 33). However, Plaintiff has made several specific objections to the Report. Each objection is addressed below.

### A.    OBJECTION 1 - RETALIATION

Plaintiff generally objects to the Magistrate's finding that her retaliation claim should be dismissed. (ECF No. 46 p. 2). Specifically, Plaintiff objects to the Magistrate's finding that the Defendant's proffered reason for firing Plaintiff was not pretext for discrimination. The Defendant's argues that it fired Plaintiff because Plaintiff surreptitiously copied personnel files and because Plaintiff initially denied doing so. However, Plaintiff argues that she copied her own personnel file, which is not a firing offense, and thus the Defendant's reason is pretext for its retaliation against Plaintiff for filing a hostile work environment claim against Defendant three weeks before Defendant terminated her employment.

Title VII makes it unlawful for an employer to retaliate against an activity that is protected under the statute, including filing a complaint with the equal employment opportunity commission. *See* 42 U.S.C. § 2000e–3(a). The elements of a *prima facie* retaliation claim are as follows: (1) the employee engaged in an activity protected under the statute; (2) the employer acted adversely against the employee; and (3) there was a causal connection between the employee's protected activity and the employer's adverse action. *See Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008).

Retaliation claims are generally analyzed under the *McDonnell Douglas* burden-shifting framework when the Plaintiff introduces circumstantial evidence to support her claim. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination, and then the burden shifts to the defendant to produce evidence that it had a legitimate, nondiscriminatory reason for its actions against the employee-plaintiff. *See Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). The defendant's burden is a "burden of production, not persuasion." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the defendant meets this burden, the plaintiff must then prove, by a preponderance of the evidence, that the defendant's proffered reason for its action or actions was "pretext for discrimination." *Merritt*, 601 F.3d at 294 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The Supreme Court has held that "a

plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 135. The Court further stated,

> [T]here will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Id.* at 148. In these such circumstances, summary judgment would be appropriate. *See id.*

"Protected activities fall into two distinct categories: participation or opposition." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253 258–59 (4th Cir. 1998) (citing 42 U.S.C. § 2000e–3(a)). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *See id.* at 259. Some of these protected activities include the following: "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." *Id.*

The Plaintiff engaged in a protected activity when she filed a hostile work environment complaint ("HWE Complaint"), wherein she described a racially charged conversation between Plaintiff and her coworkers. In that report, Plaintiff reported an

incident wherein her fellow employees accused Plaintiff of having family members in the Ku Klux Klan ("KKK"). *See* (ECF No. 33-16 p. 2). Plaintiff reported this incident on July 17, 2015. *Id.* The Fourth Circuit has recognized that the KKK is a group dedicated to racial hate. *See Smith v. United States*, 262 F.2d 50, 50 (4th Cir. 1958). Thus, Plaintiff has at least presented a jury question regarding whether she engaged in a protected activity when she reported that her fellow employees had accused her of having ties to the KKK.

Furthermore, the Plaintiff experienced an adverse employment action when she was fired. Thus, Plaintiff has established the second element of the *prima facie* test for retaliation.

Next, the Plaintiff must establish whether there was a causal connection between the protected activity and the adverse employment action. Such a causal connection may be established through a temporal proximity between an employee's protected activity and an employer's adverse employment action. *See Waag v. Sotera Defense Solns., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017) ("[F]or purposes of establishing a prima facie case [of retaliation], close temporal proximity between the activity protected by the statute and an adverse employment action may suffice to demonstrate causation."); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (finding a causal connection between protected activity and discharge where discharge occurred about three months after plaintiff filed a discrimination complaint). Here, the Defendant fired Plaintiff about three weeks after she filed her hostile work environment complaint.

The Defendant argues, and the Magistrate agrees, that the Plaintiff likely broke the

causal chain by copying her personnel documents and initially denying that she did so. Although she initially denied copying the documents (ECF No. 22-4 p. 2), she admitted to doing so on the same day at around 12:00 p.m. (ECF No. 22-5 p. 2).

Plaintiff complained about the KKK conversation on July 17; she was suspended on August 5; and she was terminated on August 11. As the Magistrate noted, this temporal proximity would typically establish causal connection. *See Williams*, 871 F.2d at 457.

Assuming Plaintiff can establish a causal connection between her HWE Complaint and her termination, Plaintiff can likely establish a *prima facie* case of retaliation, and thus the burden of production shifts to the Defendant to provide a nondiscriminatory reason for terminating Plaintiff's employment. *See Burdine*, 450 U.S. at 254. The Defendant asserts that it fired Plaintiff because Plaintiff removed her own personnel file from Head Nurse Wanda Sermon's inbox and made copies and because, when Mitchell questioned Plaintiff about this incident, Plaintiff initially denied having copied the documents. (ECF No. 22-4 p. 2).

Since Defendant proffered a nondiscriminatory reason for terminating Plaintiff's employment, the burden now shifts to Plaintiff to show that the Defendant's proffered reason was pretext for discrimination. *See Merritt*, 601 F.3d at 294. To meet this burden, Plaintiff must show that retaliation was "a but-for cause of [the] challenged adverse employment action." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015). Thus, Plaintiff must show that her termination would not have occurred but for the

Defendant's retaliatory motive. *See id.*

The Magistrate stated in her Report that Defendant met its burden of production because "Defendant has presented sufficient evidence that Plaintiff was terminated for improperly removing confidential personnel documents and initially misrepresenting her actions." (ECF No. 41 p. 34). The Magistrate relied heavily on *Laughlin v. Metropolitan Washington Airports Authority* to support her assertion that Defendant's proffered nondiscriminatory reason for firing Plaintiff was sufficient to overcome Plaintiff's attempt to prove it was, in fact, pretext for discrimination. *Id.*

Plaintiff's specific objection to the Magistrate's Report is this: the file Plaintiff copied, which was the Defendant's proffered basis for her termination, bore *Plaintiff's name*; it was Plaintiff' own, personal file; and Plaintiff did not take anyone else's information. (ECF No. 46 p. 7).

In *Laughlin*, the plaintiff's fellow employee, Kathy LeSauce, had filed an informal complaint with an EEO officer against her supervisor, William Rankin, alleging that Rankin had retaliated against her in violation of Title VII. *Laughlin*, 149 F.3d at 256. LeSauce initially took her complaint to a manager, Augustus Melton. *Id.* LeSauce then filed a formal complaint and resigned from her job. *Id.* Thereafter, the manager, Melton, drafted a written warning to Rankin regarding the dispute, but he never formalized the warning, and he left it on his desk without Rankin seeing it. *Id.* The plaintiff, Karen Laughlin, was Melton's secretary, and she discovered a copy of the warning on Melton's desk. *Id.* Laughlin removed the documents, copied them, and placed them back on

Melton's desk, and she subsequently sent copies of the documents to LaSauce. *Id.* Laughlin's actions were discovered a few years later during a deposition in a civil suit filed by LaSauce, and Laughlin was subsequently fired. *Id.*

The court determined that the "decision to terminate Laughlin was sound." *Id.* at 260. The court reasoned that the "employer's interest in maintaining security and confidentiality of sensitive personnel documents outweigh[ed] Laughlin's interest in providing those documents to LaSauce." *Id.* The court further reasoned that "[t]he [defendant] had a reasonable and significant interest in preventing the dissemination of confidential personnel documents" and that "Laughlin had breached her employer's trust by copying confidential material and sending it to an outside party." *Id.*

Here, however, Nimmons' actions do not rise to the same level as the Plaintiff in *Laughlin* because Nimmons copied only her own personnel file. Moreover, Nimmons did not distribute any such files to a third party. For this reason, Nimmons' actions are dissimilar to the plaintiff's actions in *Laughlin*. Thus, Plaintiff argues that the Defendant's proffered reason for terminating her employment is pretext for retaliation. (ECF No. 46 p. 7).

Plaintiff argues that "Defendant terminated Plaintiff because she was complaining that several African American co-workers were targeting her." *Id.* In her deposition, Plaintiff stated that Mitchell, one of her supervisors, told her, "I promise you I'm going to get you fired" and "[a]ny chance I get, I'm going to get you fired." (ECF No. 22-13 p. 40). Plaintiff stated that these threats occurred after she complained about the "KKK

conversation" and that the threats were a result of her reporting that incident. *Id.*

The inquiry thus boils down to whether the Defendant would have fired Plaintiff for copying her own personnel file and initially denying it, or whether the firing was merely pretext for SCDC's retaliation against Plaintiff for filing the HWE Complaint. Considering the evidence in a light most favorable to the Plaintiff, the question of whether the Defendant had a retaliatory motive for Plaintiff's termination is one best suited for a jury. Plaintiff filed multiple reports with her employer, and one such report was the HWE Complaint she filed on July 17, 2015, which would surely constitute a "protected activity" under Title VII. Thereafter, on August 6, 2015, Defendant terminated Plaintiff's employment because Plaintiff surreptitiously copied her own personnel file from the head nurse's office and initially denied doing so. Whether Plaintiff has demonstrated, by a preponderance of the evidence, that the Defendant would not have fired Plaintiff but for doing so in retaliation for her HWE Complaint is a question best left to the jury.

Therefore, the Defendant's Motion for Summary Judgment should not be granted as to Plaintiff's claim for retaliation under Title VII.

## B.     OBJECTION 2 - HOSTILE WORK ENVIRONMENT

To demonstrate a hostile work environment claim under Title VII, a plaintiff must show that she (1) experienced unwelcome harassment; (2) the harassment was based on her race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive atmosphere; and (4) there is a basis for

imposing liability on the employer. *See Boyer-Liberto v. Fountainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015); *Baqir v. Principi*, 434 F.3d 733, 745–46 (4th Cir. 2006).

To establish the second element—that the harassment a plaintiff experienced was, in fact, based on her race—a plaintiff must show that her race was the but-for cause of her harassment. *See Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998); *see also Graham v. Prince George's Cty.*, 191 F. App'x 202, 204 (4th Cir. 2006) (requiring that the hostile environment not only exist, but that it also must be based on the plaintiff's race).

To establish the third element—that the harassment was severe or pervasive enough to create an abusive work environment—courts look at the totality of the circumstances. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."). This determination may be based on several factors, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* The court may consider another factor: "[t]he effect on the employee's psychological well-being." *Id.*

However, evidence of the alleged harassment requires more than speculative or conclusory allegations. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) ("Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case.") (internal quotation

marks omitted); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) ("While a Title VII plaintiff may present direct or indirect evidence to support her claim of discrimination, unsupported speculation is insufficient."); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 584–85 (6th Cir. 1992) ("[T]he statements contained [in the hearsay affidavit] are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law.").

"Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). Thus, complaints must be premised on something more than "rude treatment by coworkers, callous behavior by one's supervisors, or a routine difference of opinion and personality conflict with one's supervisor" to be "actionable under Title VII." *Id.* at 315–16 (internal quotation marks omitted) (quoting *Baqir*, 434 F.3d at 747; *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761,765 (4th Cir. 2003); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000)).

> The task then on summary judgment is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion. That is, instances where the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere.

*Id.* at 316 (citing *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007)).

It is undisputed that the conduct Plaintiff experienced was unwelcome. Plaintiff

filed eleven (11) incident reports between 2014 and 2015, stating that she was experiencing conduct that she clearly found unwelcome.

On August 6, 2014, Plaintiff filed an incident report wherein she complained that, while she was speaking with the Head nurse, Wanda Sermons ("Sermons"), Sermons stated in front of multiple employees that she would start "writing people up." (ECF No. 33-2).

On November 17, 2014, Plaintiff filed an incident report wherein she complained that she tried to ask a medical technician, C. Dunn ("Dunn"), to help with her attempt to transfer, but Dunn refused to help. (ECF No. 33-4 p. 2).

On December 29, 2014, Plaintiff filed an incident report wherein she complained that Monique Spain ("Spain") yelled at her in front of other employees when she made Spain aware that an appointment date was incorrect. (ECF No. 33-5 p. 2). Further, in the same report, Plaintiff stated that Spain makes her work a hostile environment. *Id.*

On January 6, 2015, Plaintiff filed an incident report wherein she complained that Spain again raised her voice at Plaintiff, and Plaintiff asked Spain "why she is always so mean to [Plaintiff]," and Spain "told everyone that they need to tell [Plaintiff] she need[s] to recognize." (ECF No. 33-6 p. 2).

On January 12, 2015, Plaintiff filed an incident report wherein she complained that Dunn again refused to assist Plaintiff with her attempt to transfer. (ECF No. 33-7 p. 2).

Plaintiff filed a second report on January 12, 2015, complaining that medical technician, Ashley Mickens ("Mickens") raised her voice at Plaintiff and threatened to

write her up. (ECF No. 33-8 p. 2).

On March 4, 2015, Plaintiff filed an incident report wherein she complained that Dunn had been negligent in carrying out her duties. (ECF No. 33-10 p. 2). In this particular incident report, Plaintiff's Supervisor, Wanda Sermons, commented on the report, stating that no negligence occurred and that she would ask the techs to work together. *Id.*

On April 8, 2015, Plaintiff filed an incident report wherein she complained that Dunn told her to go on disability and that there should be a disability for Plaintiff. (ECF No. 33-11 p. 2). Plaintiff stated in the report that she felt the comment was discriminatory and demeaning. *Id.*

On May 1, 2015, Plaintiff filed an incident report wherein she complained that Mickens told her not to interrupt Mickens' and Dunn's conversation. (ECF No. 33-12 p. 2). Mickens also allegedly told Plaintiff that she should see a doctor and get "crazy pills." *Id.* Additionally, Plaintiff claims Mickens also stated that Mickens' blood was "boiling" and that Plaintiff needed to leave so that Mickens would not "say or do anything." *Id.* Plaintiff stated in the report that she felt the comments about her being crazy were discriminatory. *Id.*

On July 14, 2015, Plaintiff filed an incident report wherein she complained that an altercation involving Mitchell and Dunn had taken place and that Mitchell stated that she was "done" with Plaintiff. (ECF No. 33-14 p. 2).

On July 21, 2015, Plaintiff filed an incident report wherein she complained that

yet another altercation had taken place. (ECF No. 33-18). This time the altercation involved Mitchell, Sermons, and Ballard. *Id.*

With these eleven (11) incident reports, Plaintiff has demonstrated that she found her treatment at work to be "unwelcome."

Next, Plaintiff must demonstrate that the hostile treatment she experienced at work was due to her race. *See Boyer-Liberto*, 786 F.3d at 277. The Magistrate determined that the Plaintiff has not demonstrated that the hostility she experienced was "because of" her race. (ECF No. 41 p. 18, 22). Plaintiff specifically objects to this finding, directing the Court to two particular pieces of evidence. (ECF No. 46 p. 9).

The first is the Plaintiff's deposition testimony that she overheard a co-worker, Mickens, use the word "cracker" in relation to her. *Id.* Plaintiff claims that "cracker" is a racial slur and directs this Court to *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326 (4th Cir. 2010). In *Mosby-Grant*, the plaintiff overheard peers using the terms "honky" and "cracker." *Id.* at 330. The court noted that such terms are "racially charged" and that the use of such terms could create a "discriminatory atmosphere." *Id.* at 335–36 ("When viewed cumulatively with the evidence of sex-based harassment, the recruits' use of racially charged terms like 'honky,' 'cracker,' and 'f*****g Mexicans' may also lead a jury to reasonably conclude that a discriminatory atmosphere was pervasive at the Academy.")

The second piece of evidence that Plaintiff relies on is her HWE Complaint, which she filed on July 17, 2015. (ECF No. 22-10). In her HWE Complaint, Plaintiff describes

an incident wherein several of her co-workers accused her of being a member of, or otherwise associated with, the Ku Klux Klan. *Id.* The SCDC responded to the HWE Complaint by letter (the "Letter") on July 17, 2015, acknowledging receipt of Plaintiff's HWE Complaint and further acknowledging that the comments directed at Plaintiff were "derogatory." (ECF No. 22-11 p. 2). The Letter also stated that "[t]he employees involved in th[e] incident [we]re Charisse Dunn, Infiniti Ballard and Ashley Mickins-Hopkins." *Id.* The Letter stated that the writer had "interviewed all parties mentioned in" the HWE Complaint and that the writer "determined that the statements/comments made by the employees were totally insensitive and inappropriate and should be addressed by management." *Id.*

The Plaintiff notes that the Fourth Circuit has acknowledged that the KKK is a hate group, directing the Court to *Smith V. United States*, 262 F.2d 50 (4th Cir. 1958). (ECF No. 46 p. 10). In *Smith*, the Fourth Circuit held that the "[r]efusal to permit questions on voir dire examination, asked in good faith, as to the membership in the Ku Klux Klan has been held to be reversible error in a long line of cases which are collected in 31 A.L.R. 411; 158 A.L.R. 1362; and 54 A.L.R.2d 1211." *Id.* at 50. Thus, accusing someone of being a member of a racial hate-group like the KKK is inherently racial.

Next, Plaintiff must show that the harassment she endured was sufficiently severe or pervasive to rise to the level of a hostile work environment. "This standard requires an objectively hostile or abusive environment—one that a reasonable person would find hostile or abusive—as well as the victim's subjective perception that the environment is

abusive." *Harris*, 510 U.S. at 17.

The Magistrate argues that Plaintiff has not met her burden as to the objective prong of the test, stating that "a reasonable jury would not find the situations Plaintiff describes to be 'sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment.'" (ECF No. 41 p. 21).

Moreover, the determination of whether an environment is objectively hostile or abusive "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22; *see also id.* at 24 (Scalia, J., concurring) (noting that the objective prong of the severe and pervasive test is not "a very clear standard").

"[A]n isolated incident of harassment can amount to discriminatory changes in the terms and conditions of employment, if that incident is *extremely serious*." *Boyer-Liberty*, 786 F.3d at 277 (emphasis added). An incident of harassment is more serious if the harasser is a supervisor than if the harasser is a co-worker. *See id.* at 278. Where the harassing employee is the victim's co-worker, however, a plaintiff must show that the employer was "negligent in controlling working conditions." *Id.* at 278 (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)). "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance*, 570 U.S. at 424.

Here, the Court must determine whether Plaintiff's reported incident was "extremely serious" because the HWE Complaint is the only complaint Plaintiff filed that is unambiguously race related. Clearly, being identified as a member of a group like the

KKK can have devastating effects on the life and career of a person. In the current political climate, a person can lose his or her job and experience true hardship by being associated with such groups. *See, e.g.*, Gillian B. White, *Is Being a White Supremacist Grounds for Firing?*, The Atlantic (Aug. 14, 2017), https://www.theatlantic.com/business/archive/2017/08/charlottesville-employment/536838/; Michael Majchrowicz, *Ridgeville Man Out of a Job Following Photo Next to Charlottesville Murder Suspect*, The Post and Courier (Aug. 14, 2017), https://www.postandcourier.com/news/ridgeville-man-out-of-a-job-following-photo-next-to/article_d780c622-811d-11e7-888e-7723428033b4.html. Moreover, being tied to such a group can result in violence and physical injury. *See, e.g.*, Aric Jenkins, *Protesters Confront Ku Klux Klan Members at Contentious Virginia Rally*, Time (Jul. 8, 2017), http://time.com/4850427/ku-klux-klan-kkk-charlottesville-virginia-rally/.

A reasonable jury could find that Plaintiff's workplace environment was hostile due to the fact that Plaintiff was accused of being a member of the KKK by multiple co-workers. Plaintiff also allegedly overheard a coworker use the racial slur, "cracker." (ECF No. 22-13 p. 21–22). Looking at the totality of the evidence, a factfinder could conclude that the racially-charged comment, combined with Plaintiff's coworkers' accusation of Plaintiff's family's ties to the KKK could rise to the level of a hostile work environment. *See Harris*, 510 U.S. at 23 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.").

The Magistrate stated that Plaintiff "played off the KKK comments that were

made by other med techs by making some of her own." (ECF No. 41). The evidence, however, does not suggest that Plaintiff made insulting racial comments to her co-workers. *See* (ECF No. 22-13 p. 33–35). Plaintiff responded to her coworkers' accusations by stating that she had family in the KKK. *Id.* at 33–34. However, Plaintiff stated in her Deposition that this was an attempt "to joke back to make it where [her coworkers] didn't see that [she] was hurt." *Id.* at 33. In her Deposition, Plaintiff stated that her response to her coworkers' was as follows: "I was, like, okay, yeah, whatever, family member, yea, okay, yea, I do, whatever, whatever. I'm just trying to move along. And then I went to the bathroom and started crying." *Id.* at 37. She also stated that, if she were to show that she was hurt by her coworkers' statements, she feared that her co-workers would "get worse on [her]." *Id.* at 35. Plaintiff stated that she "made a joke just so [she] could move it along so they'd just leave [her] alone for the rest of the day and [she] could get [her] job done." *Id.* at 36. Additionally, in her deposition, Plaintiff stated, "I don't have any family members in the Klan." *Id.* at 33.

Moreover, Plaintiff stated that, after these comments were made, she "went to the bathroom and cried." *Id.* at 35, 37. Such a reaction demonstrates that the abuse Plaintiff complains of could be sufficiently severe to support a hostile work environment claim. *See Harris*, 510 U.S. at 22 ("Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct."); *see also id.* at 25 (Ginsburg, J., concurring) (stating that, in the context of a hostile or abusive work environment claim, the inquiry should "center, dominantly, on

whether the discriminatory conduct" would "make it more difficult" for a reasonable person to do his or her job).

The fourth prong of the test for a hostile work environment claim—whether the Defendant had knowledge of the existence of a hostile work environment and took no action—is clear. *See* (ECF No. 41 p. 22 n.13). Plaintiff filed numerous incident reports and a Hostile Work Environment claim. Moreover, the Defendant sent Plaintiff a letter, acknowledging that it had received Plaintiff's HWE Complaint. (ECF No. 33-16 p. 2).

Therefore, the question of whether Plaintiff's work environment was sufficiently severe and pervasive to rise to the level of a hostile work environment should be presented to a jury.

## C.   OBJECTION 3 - DISPARATE TREATMENT

Plaintiff broadly objects to the Magistrate's finding that Defendant should be granted summary judgment as to Plaintiff's Title VII disparate-discipline claim. (ECF No. 46 p. 13). In her broad objection, Plaintiff merely reasserts arguments from her Response to Defendant's Motion for Summary Judgment (ECF No. 33 p. 18–20), which the Magistrate thoroughly addressed in her Report (ECF No. 41 p. 22–27).

A specific objection to the Magistrate's Report requires more than a reassertion of arguments. *See Workman v. Perry*, No. 6:17-cv-00765-RBH, 2017 WL 4791150, at *1 (D.S.C. Oct. 23, 2017). A specific objection must "direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). "Generally stated, nonspecific objections have the same effect as

would a failure to object." *Staley v. Norton*, No. 9:07-0288-PMD, 2007 WL 821181, at *1 (D.S.C. Mar. 2, 2007) (citing *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991)). The Court reviews portions "not objected to—including those portions to which only 'general and conclusory' objections have been made—for *clear error.*" *Id.* (emphasis added) (citing *Diamond*, 416 F.3d at 315; *Camby*, 718 F.2d at 200; *Orpiano*, 687 F.2d at 47).

Therefore, because Plaintiff has failed to make a specific objection to the Magistrate's finding, Plaintiff's general objection to the Report requires no further review, and the Defendant's Motion for Summary Judgment is granted as to Plaintiff's claim for disparate treatment under Title VII.

## IV.     CONCLUSION

After carefully reviewing the applicable laws, the record in this case, as well as the Report, this Court adopts the Magistrate's Report and Recommendation in part. The Defendant's Motion for Summary Judgment (ECF No. 22) is granted as to Plaintiff's disparate treatment claim under Title VII. However, Defendant's Motion is denied as to Plaintiff's hostile work environment and retaliation claims under Title VII. This case will be calendared for trial during the July/August term of court with jury selection on July 11, 2018.

IT IS SO ORDERED.

Joseph F. Anderson, Jr.

May 30, 2018                                                    Joseph F. Anderson, Jr.
Columbia, South Carolina                                United States District Judge